

FILED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

JAN 3 0 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

1

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                   **WESTERN DIVISION**

11   MARIO CHACON HERNANDEZ,          )   No.  CV 06-7519-JFW (AGR)
                                      )
12              Petitioner,           )
                                      )   ORDER ADOPTING MAGISTRATE
13        v.                          )   JUDGE'S REPORT AND
                                      )   RECOMMENDATION
14   VICTOR M. ALMAGER, Warden,       )
                                      )
15              Respondent.           )
     ─────────────────────────────────)

16

17        Pursuant 28 U.S.C. § 636, the Court has reviewed the entire file de novo,

18   including the magistrate judge's Report and Recommendation.  The Court agrees

19   with the recommendation of the magistrate judge.

20        IT IS ORDERED that Judgment be entered denying the Petition and dismissing

21   this action with prejudice.

22

23   DATED: _____1/29/08_____   _____
                                          JOHN F. WALTER
24                                    UNITED STATES DISTRICT JUDGE

25

26

27

28

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11   MARIO CHACON HERNANDEZ,        )        NO. CV 06-7519-JFW (AGR)

12              Petitioner,          )

13                                   )
                  v.                 )
14                                   )        REPORT AND
     VICTOR M. ALMAGER, Warden,      )        RECOMMENDATION OF UNITED
15                                   )        STATES MAGISTRATE JUDGE
              Respondent.            )
16                                   )

17   ─────────────────────────────  )

18        The Court submits this Report and Recommendation to the Honorable

19   John F. Walter, United States District Judge, pursuant to 28 U.S.C. § 636 and

20   General Order No. 05-07 of the United States District Court for the Central District

21   of California.  For the reasons set forth below, the Magistrate Judge recommends

22   the Petition for Writ of Habeas Corpus be denied.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

# I.

## SUMMARY OF PROCEEDINGS

On February 15, 2005, a Los Angeles County Superior Court jury convicted Petitioner of second-degree murder. (Answer at 1.) On May 18, 2005, the court sentenced Petitioner to 15 years to life. (First Amended Petition ("Petition") at 2.) On May 16, 2006, the California Court of Appeal affirmed Petitioner's conviction. (Lodged Document ("LD") 4.) On August 16, 2006, the California Supreme Court denied review without explanation. (LD 6.)

On March 19, 2007, pursuant to 28 U.S.C. § 2254, Petitioner filed a First Amended Petition for Writ of Habeas Corpus by a Person in State Custody in this Court in which he raised the following numbered grounds: (1, 2, 3, & 5) instructional error, (4) *Miranda* and ineffective assistance of counsel, and (6) prosecutorial misconduct in closing argument. (Petition at 5-7.[1])

Respondent filed an answer on June 8, 2007. Petitioner filed a Reply on October 19, 2007. This matter was taken under submission and is now ready for decision.

# II.

## STATEMENT OF FACTS

Below are the facts set forth in the California Court of Appeal decision on direct review. To the extent an evaluation of Petitioner's claims for relief depends on an examination of the record, the Court has made an independent evaluation of the record specific to Petitioner's claims for relief.

1. Events Prior to the Killing of Gabrielle on February 23 or 24, 2004

Defendant went to El Salvador in December 2003. Defendant returned to

---

[1] The petition is missing page numbers. For ease of reference, the Court has marked the face page as page 1, the subsequent form pages in ascending sequence, the attached Ground Six page as page 7, and the continuation of the form after the attached pages as page 8. The Court has left intact Petitioner's pagination of the attached Ground Four Supporting Facts pages.

the United States on January 16, 2004, only to find that Gabrielle and their daughter, Gabriela, had moved to a different apartment without telling him. Late in January, Gabriela had a conversation with defendant in which defendant asked if his wife was going to reconcile with him. Gabriela told defendant that Gabrielle was not going back to him. Defendant said, "Should I kill you, kill your sister, kill your mom and then kill myself?"During the week prior to February 24, Gabriela heard defendant leave telephone messages threatening her mother.

2. Events on the Night of the Killing

Gabriela spoke to her mother on the phone at 8:30 p.m. on February 23. Gabrielle was at Bally's Total Fitness with defendant and told Gabriela she would be home soon. Gabriela called defendant's cell phone at 10:00 that evening. Defendant answered but did not speak to her. Gabriela could hear a conversation in the background in which defendant was answering questions pertaining to the whereabouts of his family.

Deputy Gerhard Ogurek was on patrol on February 23, investigating a person walking on the side of the road. A van driven by defendant from the direction of Big Tujunga Canyon Road passed Deputy Ogurek and crashed into some boulders at a curve in the road, leaving the van too badly damaged to drive. As Deputy Ogurek spoke to defendant, he noticed that defendant was trying to push items in the center of the van toward the rear compartment. Defendant said he was coming home from work in Los Angeles and that he lived in Los Angeles, which made no sense to Deputy Ogurek, since defendant was driving down from the mountains. When pressed for an explanation, defendant said he was just looking at the mountains. Paramedics transported defendant to the hospital. Defendant made no mention of a crime having occurred. Deputy Ogurek later learned

3

Gabrielle's body was recovered about one mile from Camp Ybarra, which was about five miles from the scene of the collision. Defendant, who was a Pentecostal minister, was familiar with Camp Ybarra, which was used as a Christian camp.

Gabriela called defendant's cell phone at 1:30 a.m. on February 24. Defendant said he had dropped off Gabrielle but did not disclose the location. When Gabriela told defendant she was going to the police station, defendant said he hated her and called her a parasite. Gabriela went to the 77th Division of the Los Angeles Police Department at 2 a.m. on February 24, because she believed her father was involved with killing her mother. Officer Julia Peat was working the front desk at the 77th Division Station. Gabriela told Officer Peat that her mother and father had gone to the Bally's Total Fitness and her mother had not come home.

After Officer Peat had a five-minute conversation with Gabriela, defendant walked into the station. Defendant told Officer Peat he wanted to speak to her, so they moved away from the desk so that Gabriela could not hear their conversation. Defendant said something very bad happened to his wife. Defendant said "a Black man killed his wife and he dumped her in Tujunga Canyon. "Officer Peat interrupted the conversation and spoke to her supervisor, who directed that two Spanish-speaking officers question defendant.

Defendant was then questioned in the interview room of the detective area at 77th Division Station. Defendant was advised of his Miranda rights before the interview, which he waived. Defendant said he was with his wife at the Bally's Total Fitness near Crenshaw and Century. As they were leaving the gym, two male Blacks approached and forced them into the rear compartment of their van. One of the attackers drove, while the second assailant was with Gabrielle. Defendant was ordered not to look up,

4

although at one point he saw one of the men removing Gabrielle's clothing. The van eventually stopped at the Sunland offramp of the 210 Freeway, and the two male Blacks left the scene.

Defendant told the officers that once the attackers were gone, defendant looked up and saw his wife lying unclothed, with a rope around her neck. Defendant said he was shocked, confused, and unsure of what to do. Defendant said he drove into the Angeles National Forest and threw his wife's body off the side of the road. Defendant directed the officers to a location in the Angeles National Forest, where Gabrielle's lifeless body was located about four to five feet off an embankment. Defendant said the rope he had seen around his wife's neck was still in the van. Defendant told the officers that he collided with a rock as he was driving away.

The homicide investigation was handled by Sergeant Shannon Laren of the Los Angeles County Sheriff's Department and his partner, Sergeant Shaun McCarthy. Sergeant Laren responded to the location of 4100 Big Tujunga Canyon Road where he saw Gabrielle's body. He saw blood on her face, hands, and neck, and ligature marks on her neck.

Sergeants Laren and McCarthy saw skid marks on the pavement from Big Tujunga Canyon Road to Oro Vista, and some very large boulders that had been displaced. Defendant's van was no longer at the scene of the accident. The van was later examined in a tow lot, pursuant to a search warrant, and a rope was recovered from the floorboard.

Sergeant Laren conducted a videotaped interview of defendant at 11:00 p.m. on February 24, at the Crescenta Valley Station. Deputy Martha Guerrero acted as a Spanish language translator for defendant in the interview. Before the interview, defendant was advised of his Miranda rights. It was stipulated defendant heard, understood, and waived the rights.

Defendant said in the interview that he picked up his wife at 5:00 p.m. in downtown Los Angeles. He explained that he went to the gym with his wife, who paid her expired membership fee. They left the gym at 8:30 or 9:00 p.m., getting into defendant's van. As they began to drive off, two Black men armed with guns got into their van, one through his wife's door and one through his door. Defendant was thrown in the back of the van while one of the men drove. Defendant was told he would be killed if he moved. He heard his wife screaming but could not do anything.

Defendant said that after more than an hour, the van stopped and the men took off running with defendant's money. Defendant tried to drive after them but eventually lost sight of the men. Defendant then saw that his wife was lying naked in the van. Scared, confused, and unsure of what to do, defendant told the investigating officers that he drove the van toward the mountains. He pulled the van to the side of the road and dumped his wife's body over the edge. In his confusion, defendant drove off but crashed the van into a rock. He was not hurt but the paramedics took him to the hospital.

Once defendant returned home, he said that he tried to explain to his daughter what had happened. He told his daughter it would be better if they went to the police. He went to the police station and later agreed to take the police to his wife's body.

Defendant remembered that he had been read his rights at the other station before being questioned. He was again read his Miranda rights, which he understood and defendant proceeded to talk about what happened.

Defendant told the investigators that he had separated from his wife on January 16, 2004, when he returned from El Salvador, but they still saw each other. The investigators told defendant his story was hard to believe

6

and they accused him of going to the police station only because the crash of his van in the area of his wife's body had been documented. After being urged to tell the truth, defendant said, "There needs to be a lawyer. "When asked if he wanted to talk, defendant asked if they were going to give him the death penalty. He was told they need to hear his story first.

Defendant asked for forgiveness and agreed to tell the truth. He said he loved his wife with all his heart, but she abandoned him. Defendant asked to be put to death before a firing squad.

Defendant said that when he went to El Salvador, a married man named Peter began to court his wife and had sexual relations with her. She left their house, taking everything, and leaving him without any money. He tried to win her back, but she said it was too late. He was humiliated by her. His wife eventually told defendant not to bother her anymore. She told him about her sexual relations with Peter, and defendant lost his mind, strangled her with a rope, and undressed her. She told him to kill her, but he should not have done as she said.

Gabriela called Sergeant Laren on March 16. She was afraid that defendant might be released from custody and gain access to the keys to her apartment, which had been in her mother's purse. Gabriela did not want defendant to come to her apartment because she feared he would kill her, her husband, and Peter.

An autopsy determined that asphyxia due to ligature strangulation was the cause of Gabrielle's death. Gabrielle had a red ligature mark encircling her neck, with a larger mark at the back of her neck. She had hemorrhaging consistent with strangulation. One can lose consciousness in 7 to 12 seconds by constriction of the neck and irreversible brain damage occurs in

about 7 to 12 minutes. The rope recovered from defendant's van was

consistent with the instrumentality used to cause death.

(LD 4 at 2-7 (footnotes omitted).)

### III.

### STANDARD OF REVIEW

A federal court may not grant a petition for writ of habeas corpus by a person in state custody with respect to any claim that was adjudicated on the merits in state court unless it (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Woodford v. Visciotti*, 537 U.S. 19, 21, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002) (per curiam).

"'[C]learly established Federal law' . . . is the governing legal principle or principles set forth by the Supreme Court at the time the state court rendered its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  A state court's decision is "contrary to" clearly established Federal law if (1) it applies a rule that contradicts governing Supreme Court law; or (2) it "confronts a set of facts . . . materially indistinguishable" from a decision of the Supreme Court but reaches a different result. *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).  A state court's decision cannot be contrary to clearly established Federal law if there is a "lack of holdings from" the Supreme Court on a particular issue.  *Carey v. Musladin*, 127 S. Ct. 649, 654, 166 L. Ed. 2d 482 (2006).

Under the "unreasonable application prong" of section 2254(d)(1), a federal court may grant habeas relief "based on the application of a governing legal principle to a set of facts different from those of the case in which the principle

8

1   was announced." *Lockyer*, 538 U.S. at 76; *see also Woodford*, 537 U.S. at 24-26

2   (state court decision "involves an unreasonable application" of clearly established

3   federal law if it identifies the correct governing Supreme Court law but

4   unreasonably applies the law to the facts).

5        A state court's decision "involves an unreasonable application of [Supreme

6   Court] precedent if the state court either unreasonably extends a legal principle . .

7   . to a new context where it should not apply, or unreasonably refuses to extend

8   that principle to a new context where it should apply." *Williams v. Taylor*, 529

9   U.S. 362, 407, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

10       "In order for a federal court to find a state court's application of [Supreme

11   Court] precedent 'unreasonable,' the state court's decision must have been more

12   than incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520-21, 123 S. Ct.

13   2527, 156 L. Ed. 2d 471 (2003) (citation omitted). "The state court's application

14   must have been 'objectively unreasonable.'" *Id.* (citation omitted); *see also Clark

15   v. Murphy*, 331 F.3d 1062, 1068 (9th Cir.), *cert. denied*, 540 U.S. 968 (2003).

16       "[S]tate court factual findings are presumed correct in the absence of clear

17   and convincing evidence to the contrary." *Mitleider v. Hall*, 391 F.3d 1039, 1046

18   (9th Cir. 2004); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029,

19   154 L. Ed. 2d 931 (2003) ("Factual determinations by state courts are presumed

20   correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a

21   decision adjudicated on the merits in a state court and based on a factual

22   determination will not be overturned on factual grounds unless objectively

23   unreasonable in light of the evidence presented in the state-court proceeding, §

24   2254(d)(2).").

25       In applying these standards, this Court looks to the last reasoned State

26   court decision. *Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir. 2006). To the

27   extent no such reasoned opinion exists, as when a state court rejected a claim in

28   an unreasoned order, this Court must conduct an independent review to

1  determine whether the decisions were contrary to, or involved an unreasonable

2  application of, "clearly established" Supreme Court precedent.  *Delgado v. Lewis*,

3  223 F.3d 976, 982 (9th Cir. 2000).  If the state court declined to decide a federal

4  constitutional claim on the merits, this Court must consider that claim under a *de*

5  *novo* standard of review rather than the more deferential "independent review" of

6  unexplained decisions on the merits authorized by *Delgado.  Lewis v. Mayle*, 391

7  F.3d 989, 996 (9th Cir. 2004) (standard of *de novo* review applicable to claim

8  state court did not reach on the merits).

9  ## IV.

10 ## DISCUSSION

11 ### A.    GROUNDS ONE, TWO, THREE, AND FIVE:  Instructional Error

12        "The only question . . . is 'whether [a jury] instruction by itself so infected

13 the entire trial that the resulting conviction violates due process."  *Estelle v.*

14 *McGuire*, 502 U.S. 62, 72, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (quoting from

15 *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973)).

16 "[I]t must be established not merely that the instruction is undesirable, erroneous,

17 or even 'universally condemned,' but that it violated some [constitutional right].'"

18 *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431

19 (1974).  "[W]e 'have defined the category of infractions that violate "fundamental

20 fairness" very narrowly.'"  *Estelle*, 502 U.S. at 72-73 (quoting from *Dowling v.*

21 *United States*, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990)).

22 Here, with respect to Grounds One, Three, and Five, Petitioner's "burden is

23 especially heavy" because "[a]n omission, or an incomplete instruction, is less

24 likely to be prejudicial than a misstatement of the law."  *Henderson v. Kibbe*, 431

25 U.S. 145, 155, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977).

26        The California Court of Appeal decision, which is the last reasoned

27 decision under *Davis*, addressed all four grounds.

28

1    **1.    Ground One - Denial of Instructions on Series of Events**
2    **and Burden of Proof**

3    Ground One has two subclaims.  In the first, Petitioner argues that the trial
4    court improperly denied a defense request for an instruction that an "act in the
5    heat of passion could be 'a result of a series of events which occur over a
6    considerable period of time.'" (Reply at 11.)  If the jury had found that Petitioner
7    had killed his wife in the heat of passion, it would reduce the crime from murder to
8    manslaughter.  (*Id.*)  In Subclaim Two, Petitioner contends that the trial court
9    improperly denied a defense request for instructions regarding reasonable doubt.
10   (*Id.* at 13-15.)

11   **a.    Subclaim One - Series of Events**

12   In CALJIC No. 8.42, the jury was instructed how murder may be reduced to
13   manslaughter.  (LD 8 at 424-25.)  This sentence is found in the middle of the
14   instruction:  "Legally adequate provocation may occur in a short, or over a
15   considerable, period of time." (*Id.* at 424; LD 9 at 2161.)  Petitioner, who wanted
16   to highlight his theory of the case that he was provoked over time, believed the
17   sentence was insufficient. (*See* LD 4 at 13.)  Petitioner requested that 8.42 be
18   modified to replace the sentence with the following:

19       A defendant may act in the heat of passion at the time of killing as a
20       result of a series of events which occur over a reasonable period of
21       time.  [¶]  Where the provocation extends for a long period of time,
22       take such period of time into account in deciding whether there was
23       a sufficient cooling period for the passion to subside.  [¶]  The burden
24       is on the prosecution to establish beyond a reasonable doubt that the
25       defendant did not act in the heat of passion.

26   (*Id.* at 375.)  The trial court refused the request.  (*Id.*)  The California Court of
27   Appeal concluded that under California law CALJIC No. 8.42, as given,
28   "accurately stated the law and no further instruction was required." (LD 4 at 13.)

11

1    Petitioner's claim is flawed for two reasons.  First, Petitioner's interpretation

2    of 8.42 is inaccurate.  He argues that "the manslaughter instructions given did

3    speak to the fact the jurors could find provocation that took place over either a

4    short or considerable period of time, but they did not deal with the critical matter

5    that the act in the heat of passion could be 'a result of a series of events which

6    occur over a considerable period of time.'"  (Reply at 11.)  However, the

7    instruction states that murder will be reduced to manslaughter "upon the ground

8    of . . . heat of passion."  (LD 8 at 424.)  It is clear from the first paragraph of the

9    instruction that the "heat of passion" is the result of the "provocation."  (LD 3 at 3.)

10    Thus, when the instruction states that the "provocation may occur in a short, or

11   over a considerable, period of time," it is stating the same thing that Petitioner

12   says it should, that the "heat of passion" may be "a result of a series of events

13   which occur over a considerable period of time."  (Reply at 11.)

14    Second, although Petitioner takes issue with the California Court of

15   Appeal's conclusion, he does not argue that the omission "so infected the entire

16   trial that the resulting conviction violates due process."  *Estelle*, 502 U.S. at 72

17   (citation omitted).  Petitioner's arguments rely only on state law, and a claim

18   grounded in state law is not cognizable in a federal habeas action.  *See Pulley v.*

19   *Harris*, 465 U.S. 37, 41, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1989) ("A federal court

20   may not issue the writ on the basis of a perceived error of state law.").

21    Petitioner's subclaim fails.

22                    **b.    Subclaim Two - Burden of Proof**

23   The trial court instructed the jury on reasonable doubt (CALJIC No. 2.90):

24    A defendant in a criminal action is presumed to be innocent until the

25    contrary is proved, and in case of a reasonable doubt whether his

26    guilt is satisfactorily shown, he is entitled to a verdict of not guilty.

27    The presumption places upon the People the burden of proving him

28    guilty beyond a reasonable doubt. [¶]  Reasonable doubt is defined

12

1   as follows:  It is not a mere possible doubt; because everything

2   relating to human affairs is open to some possible or imaginary

3   doubt.  It is that state of the case which, after the entire comparison

4   and consideration of all the evidence, leaves the minds of the jurors

5   in that condition that they cannot say they feel an abiding conviction

6   of the truth of the charge.

7   (LD 8 at 414; LD 9 at 2155-56.)

8        It is not clear from the petition or the reply which additional instructions

9   Petitioner believes should have been given.  (Petition at 5; Reply at 13-15.)

10  Petitioner appears to argue that the instruction, as given, was insufficient and that

11  jurors could have been confused and believed that reasonable doubt was

12  "'something more' than 'mere possible doubt,'" thereby convicting him using "a far

13  lower standard."  (Reply at 13.)  Thus, the defense, while not "attack[ing]" the

14  instruction or the definition of reasonable doubt, wanted more specificity given to

15  the jury.  (*Id.* at 14.)  Contrary to Petitioner's assertion, CALJIC No. 2.90 not only

16  states that the standard of proof is higher than "a mere possible doubt," but also

17  defines that higher standard as the lack of "an abiding conviction of the truth of

18  the charge."  (LD 8 at 414; LD 9 at 2156.)  Thus, the instruction does not permit

19  the jury to convict at "a far lower standard," as Petitioner maintains.  (Reply at

20  13.)

21       The California Court of Appeal noted that the adequacy of CALJIC No. 2.90

22  has been confirmed by every California appellate district and by the Ninth Circuit.

23  (LD 4 at 16 (citing to *People v. Hearon*, 72 Cal. App. 4th 1285, 1286-87, 85 Cal.

24  Rptr. 2d 424 (1999)[2].)  In *Lisenbee v. Henry*, 166 F.3d 997, 999 (9th Cir.), *cert.*

25  _____

26       [2]  *Hearon* concisely stated that the contention that CALJIC No. 290 is
    "defective in that it gave the jury no guidance as to the level of certainty to which it
27  must be persuaded before it could reliably determine that the prosecution has
    met its burden of proof beyond a reasonable doubt" "has no merit."  *Id.* at 1286.  It
28  instructed appellate attorneys "to take this frivolous contention off their menus."
    *Id.* at 1287.  With that backdrop, Petitioner's contention that *Hearon* "was not

1  *denied*, 528 U.S. 829 (1999), the Ninth Circuit explained that *Victor v. Nebraska*,

2  511 U.S. 1, 14, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994) "expressly condoned

3  the use of a jury instruction that uses the term 'abiding conviction' to define the

4  reasonable doubt standard."

5      Petitioner's subclaim fails.

6      **2.   Ground Two - Voluntary Manslaughter Instruction and**

7  **Intent to Kill**

8      Petitioner argues that the trial court erred in instructing the jury that

9  voluntary manslaughter requires an intent to kill.  (Petition at 5; LD 4 at 17; LD 8

10  at 423.)  On direct appeal, the California Attorney General conceded that the

11  instruction was an erroneous statement of California law.[3]  (LD 4 at 17.)

12      The Court of Appeal found that the error was harmless for the following

13  reasons.  First, the jury was instructed on the differences between murder and

14  manslaughter.  (LD 4 at 18-19.)  Second, the prosecutor argued that murder

15  ───────────────

16  trying to cut off all efforts at discussion and improvement" is disingenuous at best.
(Reply at 14.)  It is also irrelevant as the issue is whether the instruction is legally

17  adequate, not whether it may be "improved."

18      [3]  The only issue, therefore, on direct appeal was whether to apply the
federal harmless error test set forth in *Chapman v. California*, 386 U.S. 18, 23, 87

19  S. Ct. 824, 17 L. Ed. 2d 705 (1967) or the California test outlined in *People v.
Watson*, 46 Cal. 2d 818, 836 (1956), *cert. denied sub nom. Watson v. Teets*, 355

20  U.S. 846 (1957).  (LD 4 at 17.)  *Chapman* held that an error is harmless unless
"there is a reasonable possibility that the evidence complained of might have

21  contributed to the conviction."  386 U.S. at 23.  *Watson* held that the conviction
will be reversed "only if after an examination of the entire cause, including the

22  evidence, it appears reasonably probable the defendant would have obtained a
more favorable outcome had the error not occurred."  46 Cal. 2d at 836 (internal

23  citations and quotation marks omitted).  The Court of Appeal concluded that the
correct standard under California law was *Watson*.  (LD 4 at 18.)

24      Generally, the harmless error standard on federal collateral review is set
forth in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1170, 123 L. Ed. 2d 353

25  (1993):  whether the constitutional error "had substantial and injurious effect or
influence in determining the jury's verdict."  *Id.* at 638 (citation and internal

26  quotation marks omitted).  The *Watson* and *Brecht* standards are "equivalent."
*Bains v. Cambra*, 204 F.3d 964, 971 n.2 (9th Cir.), *cert. denied*, 531 U.S. 1037

27  (2000).  However, the Court notes that the collateral review standard for
instructional error, as articulated at the outset of these grounds, is a far more

28  stringent one, "'whether [a jury] instruction by itself so infected the entire trial that
the resulting conviction violates due process."  *Estelle*, 502 U.S. at 72.

1  required malice, but manslaughter did not. (*Id.* at 19.)  Third, defense counsel

2  argued that the killing was committed in the heat of passion. (*Id.*)  Fourth, neither

3  side argued that a manslaughter verdict was impossible. (*Id.*)  Finally, the

4  evidence "strongly suggests an intent to kill." (*Id.*)  Petitioner strangled Gabrielle,

5  which the coroner testified "could take up to 12 minutes" to accomplish.

6  Petitioner left threatening messages on Gabrielle's answering machine the week

7  before the killing.  Petitioner's post-crime conduct was consistent with an

8  intentional killing as he stripped the body to prevent identification, dumped the

9  body off the side of the road, failed to report the killing to the police, and

10  concocted an elaborate lie about what happened. (*Id.* at 19-20.)

11         The Court of Appeal's decision was not an objectively unreasonable

12  application of the harmless error standard. *See Mitchell v. Esparza*, 540 U.S. 12,

13  18, 124 S. Ct. 7, 157 L. Ed. 2d 263 (2003).  Petitioner presents no evidence to

14  contradict the conclusions of the Court of Appeal.[4]  Instead, he sets forth only

15  generalized legal arguments. (Reply at 17-19.)  His one factual argument is that

16  in his confession he never said he intended to kill his wife, just that he "lost it."

17  (Reply at 19-20.)  Petitioner's confession is only one piece of evidence; the jury is

18  entitled to interpret the evidence as it sees fit and draw inferences from all of the

19  evidence. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed

20  2d 560 (1979).

21         Petitioner's claim fails.

22

23

24         [4] Petitioner contends that because the jurors rejected first-degree murder,
   "they [also] rejected intent to kill."  However, the definition of second-degree
25  murder also includes an intent requirement. (LD 8 at 421.)  In fact, because the
   jury was instructed that both second-degree murder and manslaughter required
26  an intent to kill, the key difference between the two crimes, from the jury's
   perspective, was that manslaughter involved a killing in the heat of the passion.
27  Thus, it is unlikely that the jury rejected manslaughter because of the erroneous
   instruction on manslaughter.  Instead, it is far more probable that the jury rejected
28  the defense theory that Petitioner killed his wife in the heat of passion.

### 3. Ground Three - Failure to Instruct on Confession

Petitioner argues that the trial court erred in failing to instruct the jury that his out-of-court admissions should be viewed with caution. (Petition at 6; LD 4 at 24.) The Court of Appeal agreed that a cautionary instruction should have been given.[5] (LD 4 at 25.) According to the Court of Appeal, Petitioner objected to five admissions:[6] (1) he had a phone conversation with his daughter on the night of the murder in which he said he had dropped off his wife; (2) near the end of January, Petitioner asked his daughter if his wife was going to come back to him; (3) the daughter told the police she heard Petitioner leaving threatening messages on her answering machine the week before the murder; (4) the daughter told the police that Petitioner called her a "parasite," said he hated her, and threatened to call the police when she told him she was going to file a police report; and (5) the daughter told the police that Petitioner asked her, "Do you want me to kill you, kill your sister, and kill your mom and myself, too?" (LD 4 at 25.)

The California Court of Appeal found the error harmless for the following reasons. First, the trial court instructed the jury (CALJIC No. 2.27) "on the sufficiency of the testimony of one witness" (*id.* at 26.):

> You should give the testimony of a single witness whatever weight you think it deserves. Testimony by one witness which you believe concerning any fact is sufficient for proof of that fact. You should

---

[5] The standard instruction is CALJIC No. 2.70, which states "Evidence of an oral confession or an oral admission of the defendant not made in court should be viewed with caution." (LD 4 at 24-25.)

[6] In his petition, Petitioner does not set forth which out-of-court admissions were problematic. (Petition at 6.) Additionally, his allegations on this point in the reply are unclear. (Reply at 27.)

1    carefully review all the evidence upon which the proof of that fact

2    depends.

3  (LD 8 at 402; LD 9 at 2150-51.)

4        Second, the jury heard not only the daughter's testimony about the

5  statements, but also Petitioner's denials that he made the statements.  (LD 4 at

6  26.)

7        Just as in the other grounds of instructional error, Petitioner fails to analyze

8  the issue under the correct, federal standard.[7]  He never claims that the failure to

9  instruct "so infected the entire trial that the resulting conviction violates due

10  process."  *Estelle*, 502 U.S. at 72 (citation omitted).  Nor does he address the

11  heavy burden of an omitted instruction, which "is less likely to be prejudicial."

12  *Henderson*, 431 U.S. at 155.  Petitioner's arguments rely only on state law, and a

13  claim grounded in state law is not cognizable in a federal habeas action.  *See*

14  *Pulley*, 465 U.S. at 41.

15        Petitioner's claim fails.

16              **4.    Ground Five - Involuntary Manslaughter**

17        There is no clearly established Supreme Court law that requires giving a

18  lesser included offense instruction in noncapital cases.  In *Turner v. Marshall*, 63

19  F.3d 807 (9th Cir. 1995), *cert. denied*, 522 U.S. 1153 (1998), *overruled on other*

20  *grounds by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999), the court noted that

21  pursuant to *Beck v. Alabama*, 447 U.S. 625, 638, 100 S. Ct. 2382, 65 L. Ed. 2d

22  392 (1980), "failure to instruct on a lesser included offense in a *capital* case would

23  be constitutional error if there were evidence to support the instruction."  *Turner*,

24  63 F.3d at 818-19 (emphasis in original).  However, "[t]here is no settled rule of

25  law on whether *Beck* applies to noncapital cases."  *Id.* at 819.  The Ninth Circuit

26  _____

27        [7]  Petitioner appears to argue that the testimony itself was inadmissible.
     (Reply at 27 ("Petitioner cannot agree the sole issue here was whether the
28  statements were made.").)  However, Petitioner has no legal support for such an
     argument, nor did he make the argument in California.

1   has not specifically addressed the issue of whether to extend *Beck* but "has

2   declined to find constitutional error arising from the failure to instruct on a lesser

3   included offense in a noncapital case." *Id.* (citing to *Bashor v. Risley*, 730 F.2d

4   1228, 1240 (9th Cir.), *cert. denied*, 469 U.S. 838 (1984); *see also Windham v.*

5   *Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) ("Under the law of this circuit, the

6   failure of a state trial court to instruct on lesser included offenses in a non-capital

7   case does not present a federal constitutional question") (citation omitted).

8         According to *Turner*, there is an intercircuit split on the issue. *Turner*, 63

9   F.3d at 819.  The Tenth and Eleventh Circuits have found no constitutional right

10  in noncapital cases, whereas the Third and Sixth Circuits have extended *Beck* to

11  noncapital cases; and the First and Seventh Circuits have applied *Beck* only "to

12  prevent a 'fundamental miscarriage of justice.'"  *Id.*  Finally, *Turner* held that "any

13  finding of constitutional error would create a new rule, inapplicable to the present

14  case under *Teague*." *Id.*

15        This Court may not grant relief on a "claim that was adjudicated on the

16  merits in State court proceedings unless the adjudication of the claim resulted in

17  a decision that was contrary to, or involved an unreasonable application of,

18  clearly established Federal law, *as determined by the Supreme Court of the*

19  *United States*." 28 U.S.C. § 2254(d)(1) (emphasis added).  Such "clearly

20  established" Supreme Court precedent is absent. *See Keeble v. United States*,

21  412 U.S. 205, 213, 93 S. Ct. 1993, 36 L. Ed. 2d 844 (1973) (The Supreme Court

22  has "never explicitly held that the Due Process Clause of the Fifth Amendment

23  guarantees the right of a defendant to have the jury instructed on a lesser

24  included offense").  "A federal court may not overrule a state court for simply

25  holding a view different from its own, when the precedent from the Supreme

26  Court is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17, 124 S. Ct. 7,

27  157 L. Ed. 2d 263 (2003) (per curiam).  Thus, "[a]lthough lower federal court and

28  state court precedent may be relevant when that precedent illuminates the

18

application of clearly established federal law as determined by the United States Supreme Court, if it does not do so, it is of no moment." *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004), *cert. denied*, 545 U.S. 1146 (2005).

Even if this ground presented a federal question, the California Court of Appeal's decision was not unreasonable. It found that there was "no substantial evidence . . . to support a finding of involuntary manslaughter" and, therefore, no basis on which to give such the instruction. (LD 4 at 21.) Under California law, to instruct on involuntary manslaughter, there must be substantial evidence that "the defendant killed in the commission of an unlawful act, not amounting to a felony, or killed in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (*Id.*) As the state court explained, "[t]he violation strangulation of another person is not misdemeanor conduct. Strangulation is not a lawful act which might produce death in an unlawful manner. Nor can strangulation be characterized as a mere act done without due caution and circumspection." (*Id.*)

Petitioner's claim fails.

**B.     GROUND FOUR: *Miranda***

*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." "[A] suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and . . . the police must explain this right to him before questioning begins." *Davis v. United States*, 512 U.S. 452, 457, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994) (citing *Miranda*, 384 U.S. at 469-73)). "[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation."

19

1   *Davis*, 512 U.S. at 458 (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.

2   Ct. 1880, 68 L. Ed. 2d 378 (1981)).  Law enforcement officers "must immediately

3   cease questioning a suspect who has clearly asserted his right to have counsel

4   present during custodial interrogation."  *Davis*, 512 U.S. at 454 (citation omitted).

5         The test of whether a suspect has "clearly asserted his right" to counsel is

6   "objective."  *Id.* at 459.  "[I]f a suspect makes a reference to an attorney that is

7   ambiguous or equivocal in that a reasonable officer in light of the circumstances

8   would have understood only that the suspect *might* be invoking the right to

9   counsel," cessation of questioning is not required.  *Id.* (emphasis in original).  The

10  "*likelihood* that a suspect would wish counsel to be present is not the test."  *Id.*

11  (citation and internal quotation marks omitted) (emphasis in original).  "Nothing in

12  *Edwards* requires the provision of counsel to a suspect who consents to answer

13  questions without the assistance of a lawyer."  *Id.* at 460.  Although the police

14  may choose to clarify an ambiguous request, such clarification is not required.  *Id.*

15  at 461.

16        On February 24, 2004, beginning at about 9:00 p.m., Sergeant Shannon

17  Laren, the investigating officer, and Sergeant Shaun McCarthy interviewed

18  Petitioner at the police station.  (LD 9 at 682, 715; LD 7.)  The interview was

19  videotaped and a Spanish-speaking sheriff (Guerrero) was present and

20  translating.  (LD 9 at 715, 720-21.)  The tape was played for the jury without

21  objection.  (*Id.* at 910.)  The following day, defense counsel asked for a mistrial

22  based on Petitioner's references to an attorney toward the end of the interview.[8]

23  (*Id.* at 1270.)  Subsequently, the defense renewed its request for a mistrial.  (*Id.*

24  at 1814-15.)  The trial court denied the request (*id.* at 1817), finding:  (1) Guerrero

25  waited a few seconds after Petitioner's first statement in Spanish (translated into

26

27       [8] After these references to an attorney, Petitioner "admitted strangling
28  Gabrielle and disposing of her body."  (LD 4 at 28-29.)  Earlier in the interview, Petitioner fabricated a story about two Black males killing his wife.  (LD 7.)

English as "there needs to be a lawyer") and then says "what"; (2) Petitioner repeated the statement but not as loudly as the first time;[9] (3) Guerrero asked Petitioner, "do you want to talk?"; (4) Petitioner responded with a question about whether he was going to get the death penalty; and (5) at the same time as Petitioner asks the question about the death penalty, Guerrero started to tell the other sheriffs "he's asking about . . .". (*Id.* at 1817-18.) The trial court found that Petitioner's two statements about a lawyer were not clear and unambiguous requests for counsel and that his statements were inconsistent with his "level of cooperation." (*Id.* at 1818-19.)

The California Court of Appeal decision, which is the last reasoned decision under *Davis*, concluded that Petitioner's two identical statements ("there needs to be a lawyer") were "ambiguous reference[s] to counsel" and therefore insufficient to require the cessation of questioning. (LD 4 at 29.) The court reasoned that the references were "manifestly unclear. Nothing in the context of the statement articulated 'his desire to have counsel present sufficiently clearly that a reasonable peace officer in the circumstances would understand the statement to be a request for an attorney.'" (*Id.* at 30 (quoting *Davis*, 512 U.S. at 459).)

Petitioner argues that the statement "there needs to be a lawyer" is not a "conditional statement." (Reply at 5.) It was repeated. (*Id.* at 5-6.) Additionally,

---

[9] This Court has reviewed the tape. At about one hour, forty minutes into the interview, Petitioner said "Tiene que estar un abrogado." (LD 7.) Petitioner agrees that the statement, in English, means "There needs to be a lawyer." (Petition, Ground Four Supporting Facts at 2.) Based on his inflection, he did not state it as a question. It was as if he were saying it to himself. Guerrero did not translate the statement into English for the other two deputies. (LD 7.) Guerrero then said "Como?" which means "What?" (*Id.*) Petitioner repeated the same statement, but much more softly than the first time. (*Id.*) Again, Guerrero did not translate the repetition into English. (*Id.*) At that point, she leaned over toward the other two deputies and said something that was not audible on the tape. (*Id.*) Guerrero then asked Petitioner in Spanish whether he wanted to talk. (*Id.*) Petitioner asked whether they were going to give him the death penalty, which Guerrero translated into English. (*Id.*)

21

1   the statements were made after great pressure was brought to bear on him by

2   the police. (*Id.* at 7-8.) Petitioner's arguments are unavailing. First, although

3   Petitioner's statements were not conditional, they were made in the passive

4   voice, which is less clear than had they been made in the active voice. As

5   Petitioner himself correctly points out, the statement "I think I need a lawyer

6   before I say anything else" in *Davis* was sufficiently clear to halt the questioning.

7   (*Id.*) As for the alleged pressure by the police leading up to Petitioner's

8   statements, Petitioner cites no authority that says that such pressure, assuming it

9   existed, is relevant to the question of requesting counsel.

10          The California Court of appeal decision was not an unreasonable

11   application of Supreme Court law, nor an unreasonable determination of the facts

12   in light of the record before it.[10]  In *Paulino v. Castro*, 371 F.3d 1083, 1087 (9th

13   Cir. 2004), Paulino had asked the police, "Where's the attorney?" and "You mean

14   it's gonna take him long to come?"  The Ninth Circuit held that "under the

15   constraints of the current habeas statute, we cannot say that the state court of

16   appeal was objectively unreasonable in its conclusion that Paulino failed to

17   unambiguously request counsel."  *Id.* at 1088 (citing to *Clark v. Murphy*, 331 F.3d

18

19   _____

20   [10]  The Court also notes that a *Miranda* error is assessed "in the context of
     other evidence presented in order to determine whether its admission was
21   harmless beyond a reasonable doubt." *Arizona v. Fulminante*, 499 U.S. 279, 308,
     111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991).  In the habeas context, the standard is
22   whether the error had substantial and injurious effect or influence in determining
     the jury's verdict. *See Brecht*, 507 U.S. at 637; *Beatty v. Stewart*, 303 F.3d at 975,
23   994 (2002).  A court must keep in mind that "a confession is like no other
     evidence," and that "a full confession may have a 'profound impact' on the jury."
24   *Fulminante*, 499 U.S. at 296 (citation and internal quotation marks omitted).
            Even assuming Petitioner's confession were improperly admitted, it was
25   harmless under this standard.  In his taped confession, Petitioner admitted he
     killed his wife by grabbing a rope and strangling her. (LD 8 at 340.)  In his trial
26   testimony, Petitioner also admitted he killed his wife by tying a rope around her
     neck and strangling her. (LD 9 at 1891.)  In his confession and at trial, Petitioner
27   said his wife was having sexual relations with another man. (LD 8 at 329-30; LD
     9 at 1890.)  In other words, the jury heard Petitioner confess twice, once on tape
28   and again at trial.  Any possible error in admitting the taped statements made
     after Petitioner's references to an attorney was harmless.

1062, 1070 (9th Cir. 2003) (state-court decision that the statement "I think I would like to talk to a lawyer" was equivocal was not unreasonable)).

Likewise, here, this Court cannot say that the Court of Appeal's decision was unreasonable. "Where's the attorney" and "There needs to be a lawyer" are similar in their lack of clarity and focus. Petitioner initiated further conversation when he asked about the death penalty, which indicated a willingness to speak and negated any purported request for counsel he had made. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983).

Petitioner's claim fails.[11]

## C.   GROUND SIX: Prosecutorial Misconduct

In a claim of improper prosecutorial argument, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)). "Attorneys are given wide latitude during closing arguments." *Fields v. Brown*, 431 F.3d 1186, 1206 (9th Cir. 2005) (citation omitted). "[P]rosecutorial misrepresentations . . . are not to be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made." *Boyde v. California*, 494 U.S. 370, 385-85, 110 S. Ct. 1190 (1990) (citations omitted).

At Petitioner's trial, the prosecutor argued in closing as follows:

Murder can be reduced to manslaughter by sudden quarrel, heat of passion. [¶]  What's important, what the law requires is that there

_____

[11]  Petitioner's claim of ineffective assistance is conditional. (Petition, Ground Four Supporting Facts at 3 ("However, if waiver or forfeiture were an issue, counsel's ineffective representation would also come into question and raised briefly as an alternative argument for reversal.").) The Court need not address the ineffective assistance claim as neither the Court of Appeal nor this Court found that Petitioner had waived the *Miranda* argument. (LD 4 at 28.)

1    must be provocation.  This provocation must  be of the type that

2    excite and arouse passion and that the defendant acted under that

3    influence.  It must be the type of passion that would be naturally

4    aroused in the ordinarily reasonable person in the same set of

5    circumstances.  [¶]   Again, the law goes back to reasonableness.

6    All 12 of you must agree that it would be reasonable for the

7    defendant to act this way.

8    (LD 9 at 2194-95.)  Defense counsel objected that the prosecutor had misstated

9    the law.  (*Id.* at 2195.)  He said the prosecutor had argued that "the act has to be

10   reasonable."  (*Id.*)  The trial court, implicitly overruling the objection, responded

11   that "the law requires . . . that a reasonably prudent person would be so aroused

12   that he would take some more action."  (*Id.* at 2195-96.)  The prosecutor resumed

13   her argument.

14   The California Court of Appeal agreed with Petitioner's argument "that the

15   law of heat of passion does not require the jury to find that the killing of another

16   human being was reasonable."  (LD 4 at 23.)  However, the court disagreed that

17   the prosecutor had misstated the law:  "In context, the prosecutor argued that the

18   provocation must have been sufficient to arouse the passions of a reasonable

19   person."  (*Id.* at 24.)  Moreover, even if the jury had misconstrued the

20   prosecutor's comments, any error was harmless.  (*Id.*)  The jury had been

21   properly instructed on voluntary manslaughter based on heat of passion, and they

22   had also been instructed that the judge's instructions trumped the parties'

23   argument.  (*Id.*)

24   The Court of Appeal's decision was reasonable.  Its interpretation of the

25   prosecutor's argument is plausible.  As the court pointed out, the prosecutor's

26   assertion that all of the jurors had to "agree that it would be reasonable for the

27   defendant to act this way" could not be construed to mean that manslaughter

28   required reasonableness, particularly in the context of her earlier statement about

24

the reasonability test for heat of passion.  In addition, the court's conclusion that any possible error was harmless was also reasonable as the jury had been properly instructed on heat of passion.  *See Boyde*, 494 U.S. at 385 ("the arguments of counsel . . . must be judged in the context in which they are made").  Moreover, the prosecutor's continued argument was a correct statement of the law:

> So what the law requires, that the provocation must be the type to excite and arouse the passion and that the defendant, when aroused, acted under that.  [¶]  The passion must be naturally aroused and in an ordinarily reasonable person and in the same circumstances.  So what that means is that the passion must be such a passion that would be aroused in the mind of an ordinary reasonable person.  Again, the law goes back to what an ordinary reasonable person would do.[12]  [¶]  The defendant, it's very important, the defendant is not permitted to set up his own standard of conduct to justify what he does.  The defendant can't say, "Well, I was passionate, and I acted under that passion."  He cannot set up his own standard of conduct.  That is not the law.

(LD 9 at 2196-97.)

Petitioner has not shown that "the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (citation and internal quotation marks omitted).  His claim fails.

------

[12]  Based on this sentence, Petitioner implies that the prosecutor has again misstated the law.  (Reply at 24.)  It is quite clear from the prosecutor's comments that her sole objective was to ensure that the jury realized that the heat of passion test was not a subjective one from Petitioner's perspective, but an objective one from the perspective of a reasonable person.

# V.

## **RECOMMENDATION**

For the reasons discussed above, it is recommended that the District Court issue an Order (1) adopting this Report and Recommendation and (2) directing that judgment be entered denying the petition and dismissing this action with prejudice.[13]

DATED: December 18, 2007

*Alicia G. Rosenberg*

ALICIA G. ROSENBERG
United States Magistrate Judge

---

[13] Although Petitioner requests an evidentiary hearing, he does not identify any factual allegations in dispute.  There are no factual allegations that, if true, would entitle Petitioner to federal habeas relief.  No evidentiary hearing is necessary.  *Schriro v. Landrigan*, 127 S. Ct. 1933, 1940, 167 L. Ed. 2d 836 (2007).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE

Reports and Recommendations are not appealable to the Court of Appeals, but are subject to the right of any party to file Objections as provided in the Local Rules Governing Duties of Magistrate Judges, and review by the District Judge whose initials appear in the docket number.  No Notice of Appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the Judgment of the District Court.